IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BRICKLAYERS AND TROWEL TRADES INTERNATIONAL PENSION FUND and INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS and ITS LOCAL AFFILIATED UNION #8 SOUTHEAST (FORMERLY LOCAL #5 OF TENNESSEE), | ) ) ) ) ) ) ) ) ) | NO. 3:15-cv-00977 JUDGE CAMPBELL |
| Appellants, | ) ) | On Appeal from the United States Bankruptcy Court for the Middle District |
| v. | ) ) | of Tennessee Chapter 11 |
| WASCO, INC. AND LOVELL'S MASONRY, INC. | ) ) ) | Case No. 3:15-bk-00068 Judge Mashburn |
| Appellees. | ) | |

**MEMORANDUM OPINION**

Pending before the Court is an appeal of the Bankruptcy Court's orders confirming Appellees' Second Amended Joint Chapter 11 Plan and denying Appellants' motion to dismiss. For the reasons set forth herein, the Court will reverse both orders.

I.    **Factual Background and Procedural History**

Wasco, Inc. ("Wasco") is one of the largest commercial masonry contractors in the region. Lovell's Masonry, Inc. ("Lovell's") is a wholly owned subsidiary of Wasco that also engages in the masonry business. Wasco and Lovell's (referred to herein as the "Debtors") are Tennessee corporations based in Nashville and Columbia, Tennessee, respectively. Since 2010, Debtors' combined revenues have been between $24 and $27 million annually. Wasco was founded in 1966 by William A. Sneed, Sr., father of the current President and CEO, William A. "(Andy)" Sneed Jr., and uncle to the current Chairman of the Board, Bradford S. ("Brad") Procter. Three of the founder's

grandchildren—Andy Sneed's sons, Adam and William, III (whom the Court infers goes by the name "Trey"), and Brad Procter's son, Brian—are also shareholders, active employees, officers, and directors. The bankruptcy court refers to these five individuals as "insiders." Wasco is 99% owned by the Sneed and Procter families, according to the Bankruptcy Court's findings, though some non-family employees have ownership interests in the company. (Docket No. 27-2 at 7 (August 27, 2015 Bankruptcy Court Confirmation Hearing Transcript)).[1] Andy Sneed and his siblings (who are also shareholders) form the Sneed Family General Partnership (the "Family Partnership"), which rented office space to the Debtors for the years proceeding the Chapter 11 filings. The Family Partnership comprises a subset of four of the twenty-one shareholders of Wasco. Andy Sneed and Brad Procter, through their Third Avenue Associates partnership, also lease property to Debtors. In addition, Adam Sneed owns a separate company, Sneed Builders and Maintenance ("Sneed Builders"), which Debtors contract with for masonry work. Additionally, in October 2013, Adam Sneed, Trey Sneed, and Brian Procter acquired River City Masonry ("River City"), a competing masonry company, with Wasco funds. The total purchase price was $865,000. Debtors and River City share a Chief Financial Officer. Debtors have, according to the Bankruptcy Court's findings, characterized this purchase after the fact as a loan to River City. Wasco has required River City to pay only interest on this loan. (Docket No. 24-5 at A522–23 (Appellants' pagination)).

Although not addressed in the Bankruptcy Court's ruling, Appellants introduced testimony from Andy Sneed, the Debtors' CEO, and Kenneth Moore, the Debtors' CFO, about the way a

---

[1]The citations to the transcript of the Bankruptcy Court oral ruling use that court's pagination, which labels the first page of the transcript as page one, because the pagination placed on the documents by the district court and the parties overlap, making it difficult to read either.

contract was handled between Wasco and River City. This is one of the pre-bankruptcy petition financial transactions about which Appellants complain. In December 2013, Wasco won a $1.02 million contract, which it then reassigned to River City. (Docket No. 24-5 at A521 (Appellants' pagination)). Wasco then served as a subcontractor to perform much of the work. Debtors' CEO testified that, although Wasco had subcontracted an entire job in the past, "it was not a regular occurrence." (*Id*. at A475). Wasco later changed the profit split from the original plan that gave 10% profit to Wasco and 5% to River City to one that gave Wasco only 1% profit on this contract. (*Id*. at 496). Debtors' CFO acknowledged that the documentation on a different Wasco contract showed a 15% profit for Wasco. (*Id.* at 497–98).

Debtors have had a partially unionized work force for decades. For much of this period, Debtors had collective bargaining agreements ("CBAs") with the International Union of Bricklayers and Allied Craftworkers and its Local Affiliated Union #8 Southeast (formerly Local #5 of Tennessee) (the "Union"). The CBAs required Debtors to make contributions to the Bricklayers and Trowel Trades International Pension Fund ("Pension Fund"). The Pension Fund is a "multiemployer plan" governed by ERISA, as amended in 1980 by the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381–1461, and its benefits are guaranteed by the Pension Benefit Guaranty Corporation. "The ... amendments to ERISA were designed to prevent employers from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Mfrs. Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 205–06 (6th Cir.1995) (citation omitted)). "To solve this problem, the MPPAA requires that a withdrawing employer pay its share of the plan's unfunded liability." *SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters*

*& Employers Pension Fund*, 500 F.3d 334, 337 (3d Cir. 2007).

On April 30, 2011, Debtors' most recent CBA expired, and they elected not to renew it. Debtors allege that the terms of the CBA were contributing to their financial losses and impacting their ability to competitively bid for new work. Upon expiration of the CBA, Debtors' contributions to the Pension Fund ceased, triggering Debtors' "withdrawal liability," which the Pension Fund has determined to be $6.35 million dollars.[2] Pursuant to the MPPAA, Debtors were required to make monthly interim withdrawal liability payments on this debt, for a total of approximately $570,000 per year beginning in February 2012. Specifically, by the Pension Fund's calculations, the MPPAA required Wasco to make interim payments of $36,083 per month for 240 months and Lovell to make interim payments of $11,431 for 153 months. After timely making twelve interim payments, Debtors stopped making payments in February, 2013, and have, to date, made no further payment on this debt. By February 2013, Debtors were already contemplating filing for bankruptcy. (Docket No. 24-5 at A515 (Appellants' pagination)). After they stopped making their interim payments, Debtors offered to settle their withdrawal liability obligations for a lump sum payment of $2 million minus what they had already paid in interim payments.

In May 2013, the Pension Fund filed suit against Debtors in the United States District Court for the District of Columbia for the unpaid interim withdrawal liability obligations. *Boland v. Wasco, Inc.., et al.*, No. 1:13-CV-00739. On October 17, 2014, the *Boland* court granted the Rule of Civil Procedure 12(c) motion for judgment on the pleadings brought by the Trustees of the Pension Fund. *Boland v. Wasco, Inc.*, 50 F. Supp. 3d 15 (D.D.C. 2014). Wasco "concede[d] that under the statute,

---

[2]The Debtors demanded arbitration to dispute the Pension Fund's calculation of its withdrawal liability but filed bankruptcy petitions before arbitration was concluded.

'there is ordinarily an obligation' to make interim payments," *id.* at 20 (citing Wasco's Answer and Counterclaim), but requested that the court exercise its equitable power to suspend its obligation to make interim payments on the grounds that being required to make payments would cause it to suffer irreparable injury because of its "precarious financial position."*Id.* at 18–19. Wasco argued "that Congress could not have intended employers to be forced into bankruptcy by frivolous demands for interim payments or by lengthy arbitral proceedings." *Id.* at 20. The *Boland* court ruled that frivolous claims "likely would not survive long in arbitration," and, in any event, "Congress determined that regardless of potential costs to employers, arbitration would serve as the initial forum for withdrawal liability disputes." *Id.* (citing 29 U.S.C. § 1401(d)). The court held that "recognizing an equitable 'irreparable harm' exception would run afoul" of D.C. Circuit case law. *Id.* at 21 (citing *I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc.*, 789 F.2d 21, 23–24 (D.C. Cir. 1986)).

The *Boland* court further concluded that "even if the MPPAA were to permit discretionary suspension of interim payments to prevent irreparable injury, this Court would not exercise such discretion here." *Id.* at 21–22. The court explained that even in the Second Circuit, which "is the only circuit permitting a finding of 'irreparable injury,' standing alone, to excuse an employer from interim payments," the employer was required to show a 'distinct likelihood' of "business failure." *Id.* at 22 (citing *T.I.M.E.-DC, Inc. v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 580 F.Supp. 621 (N.D.N.Y.1984), *aff'd*, 735 F.2d 60 (2nd Cir.1984) (per curiam)). The court found that, "by contrast, WASCO has offered nothing but an allegation of its 'precarious financial position.' . . . Such a vague allegation, even assumed to be true, does not support an inference of any non-speculative, imminent, or severe harm sufficient to constitute irreparable injury in this context."

*Id.* The court further held that Wasco could also not "seek refuge in the Fifth Circuit's approach, even if this Circuit were to adopt it." *Id.* (citing *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Mar–Len, Inc.*, 30 F.3d 621 (5th Cir. 1994)). In *Mar-Len*, the Fifth Circuit held that a court can exercise "a narrow measure of discretion to excuse payments" if it has found that a demand for interim payments is "frivolous" or "not colorable," *Id.* (citing *Mar-Len*, 30 F.3d at 626). The *Boland* court found that Wasco had not alleged that the Trustees' demand for interim payments was "frivolous" or "not colorable," and that, to the extent that Wasco contests a portion of its calculated withdrawal liability, "[t]his question is for the arbitor to decide." *Id.* The *Boland* court concluded that while arbitration proceeded to resolve the dispute about the precise amount of withdrawal liability, "interim withdrawal payments 'shall be made' by Wasco." *Id.* (citing 29 U.S.C. § 1401(d)). The court requested that the Trustees file within thirty days "an updated statement of all monies owed by Wasco and of any relief it otherwise seeks," and that Wasco respond within thirty days thereafter. *Id.* The court concluded that it would "base its subsequent final order on these additional filings." *Id.*

The *Boland* court was not able to enter a final order because on January 6, 2015, less than three months after the *Boland* court's ruling on liability, Debtors filed bankruptcy petitions under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Tennessee. Although Wasco and Lovell's filed separate petitions, the cases were consolidated. Debtors claim that, although the withdrawal liability owed to the Pension Fund was the largest of the problems that led it to file for bankruptcy, it was not the only one. Debtors' appellate brief details the following addition financial problems that led to the filing of their respective bankruptcy petitions:

- In late 2012, Debtors' bonding company notified them that it was no longer willing to bond Debtors' projects because of their financial condition. Since then, Debtors have had to obtain bonds in the non-standard bonding market, which charges significantly higher rates.

- In September 2013, First Tennessee Bank terminated Debtors' line of credit, which had been in default since early 2012. Because Debtors lacked the financial resources to pay off this line of credit, $700,000 was paid by a guarantor, the Sneed Family General Partnership. Debtors executed an unsecured $700,000 note payable to the Family Partnership, approximately $650,000 of which is still owed.

- In the summer and fall of 2014, Capital Bank refused to renew letters of credit securing some of Debtors' workers' compensation liabilities and demanded payment in full of the amounts owed under those letters of credit. Debtors had to pay in excess of $1 million to satisfy these obligations. Debtors borrowed the money to pay this debt from Pinnacle Bank, and that loan was to be repaid in full by November 22, 2015. Debtors had a previous $400,000 line of credit from Pinnacle Bank that was due February 26, 2015. Pinnacle Bank was unwilling to provide a commitment for debtor in possession financing, so immediately prior to the filing of the bankruptcy petitions, Kingston Capital, LLC ("Kingston Capital") purchased the debt as part of its commitment to provide debtor-in-possession financing pursuant to § 364 of the Bankruptcy Code. Kingston Capital has filed a brief in this appeal representing that Debtors owe it over $2.2 million, nearly $1 million of which is post-petition debt that came due pursuant to the Bankruptcy Court-approved debtor-in-possession financing.

- Debtors owe "significant amounts" to suppliers of product and labor on its projects. They have paid approximately $1.8 million post-petition to suppliers of product and labor who had statutory liens.

- Debtors owe $1.12 million to two former employees, neither of whom was an owner of Wasco or a member of the Sneed or Procter families, for deferred retirement compensation.

- Debtors owed the Fidelity & Deposit Company a total of $450,000 for anticipated workers' compensation claims not covered by a cash deposit, and approximately $190,000 to other miscellaneous creditors.

(Docket No. 26 at 12–15 (Appellees' Brief)). Although Debtors had unprofitable years from 2010 to 2012, Debtors' CEO, Andy Sneed, acknowledged that 2013 and 2014 were such good financial years that he authorized the payment of hundreds of thousands of dollars in bonuses to Wasco's managers. (Docket No. 24-5 at A470 (Appellants' pagination)).

On June 9, 2015, Debtors filed their Amended Joint Chapter 11 Plan. Debtors subsequently

filed a Second Amended Plan (the "Plan") prior to the confirmation hearing to increase the new value contribution from $350,000 to $600,000 and to increase the *pro rata* distribution to unsecured creditors from $500,000 to $550,000. The Pension Fund and the Union objected to the Plan and also filed a motion to dismiss on the basis of Debtors' alleged bad faith. After a hearing on August 19–21, 2015 (the "Confirmation Hearing"), the Bankruptcy Court denied Appellants' motion to dismiss and confirmed the Plan on the condition that Debtors' shareholders increase the total new value contribution to $900,000 and increase their distribution to non-insider creditors by $300,000, to be paid on the effective date of the Plan. The Bankruptcy Court denied Appellants' request for a stay pending appeal. On September 28, 2015, this Court granted Appellants' Emergency Motion for an Order Granting a Stay Pending Appeal and Expediting Appeal. (Docket No. 17).

Appellants raise the following arguments on appeal; (1) the Bankruptcy Court erred when it held that the Debtors' Plan satisfied the new value corollary to the absolute priority rule; (2) the Bankruptcy Court erred when it held that the Debtors' Plan did not violate ERISA or 11 U.S.C. § 1129(a)(3); and (3) the Bankruptcy Court erred when it denied Appellants' motion to dismiss.

## II.    Standard of review

On appeal, this Court will only reverse the bankruptcy court's findings of fact if they are clearly erroneous but reviews *de novo* the bankruptcy court's conclusions of law. *In re Laguna Associates Ltd. P'ship*, 30 F.3d 734, 737 (6th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Sept. 9, 1994)); *In re Batie*, 995 F.2d 85, 88 (6th Cir. 1993). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re DSC, Ltd.*, 486 F.3d 940, 944 (6th Cir. 2007) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564,

573 (1985)). For a mixed question of law and fact, the Court "must break it down into its constituent

parts and apply the appropriate standard of review for each part." *In re Batie*, 995 F.2d at 88.

## III.    Analysis

### A.    Bad Faith

The Bankruptcy Court denied Appellants' motion to dismiss on the basis that the Debtors

filed for bankruptcy in bad faith. A bankruptcy court may dismiss a Chapter 11 petition "for cause."

Section 1112(b) does not define "cause," so "courts must determine whether discretionary relief is

appropriate on a case-by-case basis." *In re Laguna*, 30 F.3d at 737. Bad faith can constitute cause

for purposes of § 1112(b). *Id.* at 737–38. The Sixth Circuit has laid out the following guidelines for

courts to consider in determining whether the "totality of the circumstances" supports a finding of

good faith:

> Good faith is an amorphous notion, largely defined by factual inquiry. While no
> single fact is dispositive, courts have found the following factors meaningful in
> evaluating an organizational debtor's good faith:
>
> (1) the debtor has one asset;
>
> (2) the pre-petition conduct of the debtor has been improper;
>
> (3) there are only a few unsecured creditors;
>
> (4) the debtor's property has been posted for foreclosure, and the
> debtor has been unsuccessful in defending against the foreclosure in
> state court;
>
> (5) the debtor and one creditor have proceeded to a standstill in state
> court litigation, and the debtor has lost or has been required to post
> a bond which it cannot afford;
>
> (6) the filing of the petition effectively allows the debtor to evade
> court orders;
>
> (7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*In re Trident Associates Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir. 1995) (quoting *In re Laguna Associates*, 30 F.3d at 738) (internal brackets omitted)). The Sixth Circuit has cautioned that dismissal for lack of good faith "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence." *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991). This Court reviews the Bankruptcy Court's finding on the issue of good faith for clear error. *In re Alt*, 305 F.3d 413, 420 (6th Cir. 2002); *In re Laguna Associates*, 30 F.3d at 738.

The most salient factors related to Appellants' claim that Debtors acted in bad faith are the few unsecured debtors, the fact that the filing of Debtors' petition effectively allows them to evade the court order of the D.C. district court, and the pre-petition conduct of the debtor. Appellants argue that the lack of possibility of reorganization is also a factor supporting a finding of bad faith. They argue that the Debtors did not file for the purpose of reorganizing as all of their efforts to reorganize pre-dated the bankruptcy, such that the bankruptcy was only for the purpose of discharging its withdrawal liability debt. (Docket No. 24 at 51–55). The Bankruptcy Court rejected that argument (Docket No. 27-2 at 28). This Court need not resolve that issue because the other bad faith factors are dispositive. However, although the Court does not reach the issue of whether Debtors lacked the possibility of reorganization, the Court does note, as Appellants urge, that most of Debtors' trade creditors were paid nearly in full on their pre-petition claims, much of which was accomplished before the filing of the bankruptcy petition, the lender Kingston Capital is paid in full with interest under the Plan, and the Appellants are the most adversely impacted by the Plan. As Debtors' press

release announced, the bankruptcy "process" was virtually "unnoticeable" to many parties with whom Debtors transact business. The ways in which the withdrawal liability debt owed to Appellants received harsh treatment as compared to Debtors' other creditors factors into the Court's consideration of the totality of the circumstances related to good faith and are covered in the context of other good faith factors discussed more fully below.

### 1. Few Unsecured Debtors

The Bankruptcy Court found that this is not a single creditor case: "There are, even though the other creditors are limited, there are other creditors that are going to be paid less than in full. And certainly the secured debt is being restructured beyond what was agreed upon originally. So it's not really a single creditor case." (Docket No. 27-2 at 27). As discussed above, Kingston Capital has filed a brief in this matter, in part to bring to the Court's attention the fact that the Debtors owe it $2.2 million. However, the Bankruptcy Court also noted that Debtors' withdrawal liability debt was, by far, the majority of the debt to be addressed in the bankruptcy proceedings:

> There's no real issue being raised by any of the secured creditors. . . . Then you've got the unsecured debt. There are three classes: Class 6, Class 7, and Class 8. Class 6 is the Union and the Pension Fund; Class 7 is the Insider Unsecured Debt; and Class 8 is everyone else. The everyone else seems to be fairly limited at this point because the vast majority of the other creditors, the non-insider, non-union, non-pension fund debt, were mostly protected in some way through subcontractor (inaudible) and other ways, so that over the course of time they've generally been mostly paid. There is some debt in that class but not a large amount. So that means that with the $6.3 million combined debt between the Union and the Pension Fund, that clearly accounts for the vast majority of the unsecured debt. . . . It is worth noting that the amount the Union and the Pension Fund receives is effectively diluted by the fact that something in the $1 million range of insider unsecured debt is treated pro rata in that distribution.

(Docket No. 27-2 at 13–14).

The Debtors filed the following press release three days after they filed bankruptcy petitions.

The press release is captioned "WASCO filed Chapter 11 to Resolve Issue With Union," and includes the following information:

> Nashville-based WASCO, the sixth largest commercial masonry company in the country, has voluntarily filed to restructure under Chapter 11 of the Bankruptcy Code due to a disagreement with the Bricklayers and Allied Craftworkers Union.
>
> In May, 2011, WASCO made the decision not to renew its contract with the Union, resulting in a still unresolved disagreement about the company's obligations under the pension plan in which it used to participate. The company is currently involved in litigation to resolve this alleged pension fund withdrawal liability, which does not affect its employees who are vested in the plan as their benefits are guaranteed by the federal government.
>
> "Our operation remains strong due to our deep and longstanding relationships with contractors, suppliers and banks," said CEO Andy Sneed. "We are sound and profitable. Chapter 11 allows us protection as we continue to do business as usual."
>
> "We have tried many methods to settle or resolve this issue with the union but felt our only viable option at this point is to voluntarily file to restructure, giving us the benefit of placing a 'stay' or 'hold' on our ongoing litigation with the Pension Fund allowing us time to work towards a solution," Sneed said.
>
> He also stressed that the issue is not an 'unfunded pension liability.' "This was a penalty that was miscalculated that the Union Pension Fund hit us with when we parted ways with the Union."
>
> "WASCO is committed to making the process unnoticeable. The amounts owed for any product or services provided after the date we filed bankruptcy will be paid for in full in the ordinary course of business," he said.
>
> "Our goal is to preserve and strengthen our business so we can continue to provide the highest quality work in the commercial masonry in the marketplace," Sneed said.

(Docket No. 24-6 at 1).[3]

---

[3]The press release's proclamation that the issue is not one of an "unfunded pension liability" but instead is a "miscalculated" "penalty" is not truthful. Although Debtors dispute the precise amount of withdrawal liability it owes, a matter properly resolved in arbitration, there is no dispute that it owes some amount of withdrawal liability, as the *Boland* court concluded. It is also untruthful that the "alleged pension fund withdrawal liability," "does not affect its employees who are vested in the plan as their benefits are guaranteed by the federal government." (*Id.*) In fact, withdrawal liability is only for vested benefits. *SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pennsylvania & W.*

Wasco's press release could not have been more explicit that Wasco's bankruptcy filing was for the purpose of "frustrating one creditor," a factor courts consider in determining bad faith. *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 536 (Bankr. W.D. Tenn. 1986). Although the Bankruptcy Court is technically correct that there is more than one creditor in this matter, it seemed to think that, as a matter of law, that meant that this factor could not support a finding of bad faith. But *Laguna* is clear that a Debtors' only having a few unsecured creditors is a factor that can support a finding of bad faith. *In re Laguna Associates*, 30 F.3d at 738. The Court interprets the Bankruptcy Court's conclusion on this issue as one guided by a faulty legal analysis, which this Court reviews *de novo*. It is not clear what the Bankruptcy Court's factual finding on this issue would have been without this legal error, but to the extent, if any, that the Bankruptcy Court's conclusion was a factual finding, the Court finds that it clearly erred. It is clear from the history between the parties, as discussed below, and from the Debtors' own press release that the purpose of the bankruptcy filing was to frustrate the ability of the Pension Fund and the Union to collect the

---

*Maryland Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 337 (3d Cir. 2007) ("Section 4211 provides that the amount of an employer's withdrawal liability is the employer's proportionate share of the unfunded vested benefits existing at the end of the plan year preceding the plan year in which the employer withdraws. 29 U.S.C. § 1391(b)(2)(A)."). The federal government guarantees those vested benefits in the event of plan failure, the avoidance of which is the purpose of the MPPAA, which was "designed to prevent employers from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans." *Manufacturers' Indus. Relations Ass'n v. E. Akron Casting Co.*, 58 F.3d 204, 205 (6th Cir. 1995). To put it in plain language, the Debtors' press release announces that there is no need to worry about the fact that they are not following the federal statute that requires them to pay their share of their employees' vested pension benefits because, in the event that the Debtors' withdrawal from the Pension Fund causes the Fund to become insolvent, the federal government—the taxpayers, ultimately—will foot the bill and pay out the pension benefits due to the Debtors' bricklayer employees.

withdrawal liability to which they are legally entitled.

## 2. Debtors' Evasion of the D.C. District Court's Order

The Bankruptcy Court concluded: "I simply can't find that a business decision to use Bankruptcy, as opposed to letting litigation run the rest of its course and wait until efforts were underway to execute on a judgment could somehow constitute bad faith." (Docket No. 27-2 at 24). Again, the Bankruptcy Court seemed to believe that evasion of court orders cannot properly form the basis for a finding of bad faith. Under *Laguna*, whether "the filing of the petition effectively allows the debtor to evade court orders" is an appropriate factor for courts to consider in determining whether a bankruptcy filing was made in bad faith. *In re Laguna Associates*, 30 F.3d at 738. The Bankruptcy Court's conclusion to the contrary constitutes legal error. Again, it is unclear what the Bankruptcy Court's factual finding on this issue would have been without its erroneous understanding of the law. To the extent the Bankruptcy Court's conclusion on this bad-faith factor was a factual finding, it was premised on a faulty legal assumption and was, in any event, clearly erroneous. Debtors were unable to persuade the *Boland* court that their financial situation precluded a finding that they were liable for interim withdrawal liability obligations while their challenge to the amount of that liability was pending in arbitration. Having lost that legal argument in a federal district court, Debtors turned to bankruptcy court to avoid the *Boland* court's judgment, a strategy that it clearly had been planning for some time. Although filing for bankruptcy to obtain relief from court actions is not unusual and does not necessarily constitute bad faith, the evasion of a court order in circumstances such as these clearly supports a finding of bad faith.

## 3. Debtors' Pre-Petition Conduct

The Bankruptcy Court issued its ruling orally, including the following findings of fact and

conclusions of law on the issue of the Debtors' pre-petition conduct:

> The total compensation, including salaries and auto allowances, but not including bonuses, for [the five family member "insiders"—Andy Sneed, Adam Sneed, William Sneed, Jr., Brad Procter, and Brian Procter] total something in the neighborhood of $600,000 a year under the proposed plan

> . . .

> Although there's been no proof presented about any sort of present value analysis of any of this, obviously, the key insiders will receive several million dollars over the next five years in compensation under the Plan, as it's proposed, plus lots more beyond the Plan period if the company succeeds. And that's independent of bonuses, which can be substantial, if you look at what happened in the year before Bankruptcy when that same group of five insiders received about $300,000 in bonuses as well as about another $100,000, I believe it was, for pension fund contribution.

> . . .

> It turns out that in 2013 that was a reasonably good year for the Debtor, if you ignore the fact that it had $6 million of Pension Fund debt hanging over its head that was unpaid and not being paid.

> Without paying the hundreds of thousands of dollars in payments to the Pension Fund that it had paid in 2012, the Debtor, on paper, showed a profit. That profit, which was in large part due to not paying those Pension Fund liabilities, resulted in the Debtor paying out some large amounts of money to insiders, beyond what they had been paid in the prior year in salaries.

> Nearly $300,000 was paid out in insider bonuses. Another $50,000 or so was paid out in salary increases that year to those same insiders. There's also increases in the automobile allowances. Another $100,000 went to the insider pension fund. In other words, within a year immediately prior to Bankruptcy, at a time when the Debtor was insolvent, if the Pension Fund liability is taken into account, the insiders received extra compensation totaling upwards to the half-million dollar range.

> The insiders had been receiving something in the range of $500,000 a year in compensation before 2014 so, basically, when you add it together in the year prior to Bankruptcy, these five individuals, basically, doubled the money coming from the Debtor. And it's important to note that this is not including any of the money being paid to any other insider entities for other purposes, rent, contracts, and for advances to another insider entity we'll talk about shortly.

> ...

> One area that I think the Union and Pension Fund have a much stronger

argument about is the pre-petition insider activities. I've already talked about some of those insider transactions and I'm going to talk about them a little bit more in the context of the absolute priority rule and the new value issue. But in 2014, in the year before Bankruptcy, there were several hundred thousand dollars paid out in bonuses, additional compensation, additional expense reimbursement, additional car allowances, insider pension fund payments, and also significant advances made to allow insiders to acquire River City masonry in Kentucky. All this was at a time when no payments were being made to the Pension Fund liability and the Pension Fund liability was included on the ballot sheet, the Debtor was clearly insolvent. But those transactions did not occur in a vacuum and credible testimony of Andy Sneed and Ken Moore showed that those decisions were not made with the kind of bad intent that I think is required to make it rise to the level of bad faith.

. . .

WASCO is still contesting the Pension Fund liability, particularly as to the amount. They, for good or bad, decided not to book the withdrawal liability payments, and by not including it they decided to make certain bonus payments based on the same formulas they've used in the past.

In retrospect, that was an extremely misguided decision but most debtors who end up in Bankruptcy make some bad business decisions to get them here and, based upon the testimony I heard, I don't think it quite rises to the level of bad faith.

The money loaned to River City Masonry, on the one hand, is even more extreme in terms of the dollars involved that added up to $865,000 in a fairly short period of time. but there was testimony from Mr. Moore and Mr. Sneed that they never intended to get into the whole deal that deep. They started out, essentially, buying the good will of the business and five vehicles, and somehow it turned into an $865,000 trap.

. . .

In any event, the decision was misguided, it was questionable. It could be the subject of potential avoidance actions but I don't think it fits in the category of bad faith.

This Court does not condone or excuse any of those decisions and, in fact, those various insider transactions are going to come with a price to the insiders when it comes to the new value analysis that I'm going to get to shortly. But I think that's the appropriate place for it to show up and be addressed, as opposed to finding bad faith.

(Docket No. 27-2, Bankruptcy Court Transcript, at 8–11, 25–27).

Thus, the Bankruptcy Court concluded that the large amount of "misguided" and

"questionable" pre-petition insider financial dealings should not be determined to be bad faith, but instead should be reflected in a higher amount of new value the insiders were required to contribute as a condition of obtaining confirmation from the Bankruptcy Court. The Bankruptcy Court explained its reasoning as follows:

> Remember I said earlier that there are two components to what's being retained by these insiders, only one of which is the equity interest in an ongoing business operation.

> I'm going to talk in a moment about the other component. In my view, the $350,000 originally proposed was clearly not enough to pay for the equity interest in the business but I find that the $600,000 is enough to meet the test for new value, but only as it relates to the equity in the business and not for the significant other asset being retained.

> So what is that other asset? It's essentially a release of the insiders from all exposure to any scrutiny or pursuit of insider transactions. In the market testing, the Debtor said the avoidance actions had no value. At least that's what it said in the disclosure statement. And it may not have much value to a third party who wouldn't be excited about buying litigation.

> But to these insiders, the control of the avoidance actions assures that they will not be sued. It assures that no one will have the opportunity to further scrutinize what was done. I've already found that the transactions that serve as a major point of contention with the Union and the Pension Fund do not quite rise to the level of bad faith that would justify either dismissing the case or separately dealing a death blow to the plan, based on the lack of good faith.

> As I noted, some of the insider activity does look bad but I did not find that it quite rose to the level that would justify dismissal of the case or a finding of lack of good faith for confirmation purposes.

> . . .

> While they may not serve as a basis for a finding of bad faith, they do give rise to a totally separate analysis that needs to be done regarding the sufficiency of the new value to the extent it includes essentially buying control over avoidance litigation.

> . . .

> . . . It seems to me unquestionable that the Debtor was insolvent in 2013 and 2014. And the law in Tennessee is quite clear that a distribution to shareholders at

a time of insolvency is, by definition under the statute, a fraudulent transfer.

The Debtor paid out something in a range of $300,000 in bonuses that could arguably be characterized as distributions to equity holders rather than bonuses. It would not take much creativity on the part of a Bankruptcy Trustee to make that allegation. The same might be true of the $50,000 in salary increases in that same year before Bankruptcy. That might also apply to the $100,000 in pension contributions to the benefit of insiders.

It's possible that a creative trustee might contend that the roughly $50,000 paid to one of the insider trusts for stock redemption was really a disguised distribution at a time of insolvency. And who knows what might be pursued if all those lease related transactions involving insiders were scrutinized, as well as the various contracts that included insider companies.

In fact, putting aside compensation altogether, there was something in the range of $1.5 million in various insider transactions just relating to leases and contracts.

And, of course, there's the biggest transfer of all, the $865,000 transferred in a matter of a few months before Bankruptcy, or the year prior to Bankruptcy, to River City Masonry. That was a masonry business in Kentucky that ended up in the hands of three of the insiders, based on money paid out by WASCO.

I'm willing to accept the testimony that no one ever intended in the beginning for this much money to go to River City Masonry. I'm willing to accept explanations about how it happened and that it was not a part of any big scheme to evade liability to the Pension Fund. That's the reason I have not found bad faith. But that doesn't mean it doesn't create real exposure to several of the insiders.

The Debtor[s] ha[ve] treated these transfers as simply a basis to book a loan to River City masonry that will be paid back over the next five years. But that begs the question in terms of exposure to the insiders. There was essentially no contemporaneous documentation about these advances of money totaling $865,000. After the fact it's being treated as a loan to what was merely a shell entity when the Louisville business was acquired. I'm virtually certain that an aggressive and slightly creative trustee would say that it should be treated as a fraudulent transfer to the insiders who now own River City, or at least as a loan to those insiders rather than just a loan to a shell entity that acquired the business.

. . .

In short, while I think the $600,000 new value contribution by the insiders is sufficient to satisfy the standards set forth in the applicable case law for retaining the ownership interest in the business, I do not think it is sufficient to cover retaining control of the potential insider avoidance litigation.

. . .

     . . . Therefore, I'm going to provide some guidance about what could be done to overcome the new value problem.

. . .

     . . . I think the total new value should be at least $900,000 if the insiders want to walk away, not only with ownership of the business, but also with no exposure to being sued for the wide range of insider transactions that occurred prior to Bankruptcy Law the Debtor was insolvent. [sic]

(Docket No. 27-2 at 42–47, 50).

     As an initial matter, the Appellants argue that the Bankruptcy Court did not consider the totality of the circumstances but instead considered the factors individually, more like a checklist. The Bankruptcy Court correctly cited the totality of the circumstances test (*See, e.g., id.* at 22 ("Basically, in the Sixth Circuit the focus is on the totality of the circumstances and there's no single test for good faith."), and it did refer to it at points in its ruling. (*See, e.g., id.* at 26–27 ("And even though it's an appropriate factor to take into account, if there are enough other negative factors, I don't think it justifies any kind of finding of bad faith.")). However, there are places in the Bankruptcy Court's oral decision that sound as though the court was considering the factors individually rather than cumulatively (*see, e.g.*, *id.* at 27 ("I don't think that that factor alone really supports the idea of the bad faith finding."), and the court never explicitly discussed how it viewed the *totality* of the circumstances in this case.

     Nonetheless, even if the Bankruptcy Court properly applied the totality of the circumstances test, its legal conclusion that the insider financial transactions Debtors engaged in before filing for bankruptcy should be addressed by raising the new value required as opposed to being considered as a factor supporting a finding of bad faith constitutes legal error. The Bankruptcy Court cites no authority for its doctrinal approach, nor do any of the parties support it or cite case law in support

thereof. This Court reviews legal conclusions *de novo*. Consideration of a debtor's pre-petition conduct belongs in the bad faith analysis, not in the new value analysis. For the many reasons aptly articulated by the Bankruptcy Court, the insider financial transactions in the period leading up to the filing of the bankruptcy petition are inappropriate and troubling at best. Simply put, the case law does not support allowing Debtors to buy their way out of the bad faith that these financial transactions demonstrate through new value contributions.

The totality of the circumstances in this case demonstrates Debtors' bad faith. The Debtors discontinued making interim withdrawal liability payments which they were clearly legally required to make even while they were pursuing arbitration to determine the exact amount of their liability. At the time they stopped making interim payments, Debtors were already consulting with professionals about filing for bankruptcy. Debtors then made a series of offers to Appellants to enter a settlement agreement in which Debtors would pay considerably less in withdrawal liability than that which the Pension Fund had calculated was due. The Bankruptcy Court mentioned this as a fact that favored the Debtors. (Docket No. 27-2 at 24 ("It's not as if the Debtor was not attempting to do anything with regard to this debt. At one point it offered $2 million to settle. Just before Bankruptcy it offered $900,000 exclusive of what it had already paid.")). But Appellants were clearly under no obligation to accept less than what the Debtors owed in withdrawal liability. Appellants ultimately sought and obtained a judgment by a district court that Debtors were legally obligated to continue making interim withdrawal liability payments pending arbitration of the total amount owed. The district court rejected Debtors' claim that their financial situation allowed them to escape this liability and further held that even if it followed case law from other circuits allowing such an escape from liability in certain situations, Debtors had not met the conditions set in those

cases. Having lost in district court, Debtors filed for bankruptcy before the district court could enter final judgment. The Bankruptcy Court was incorrect, as a matter of law, that the Debtors' intention to evade the district court's order could not constitute bad faith. (Docket No. 27-2 at 24). That is plainly contrary to *Laguna*.

To make matters worse, while Debtors were making no interim withdrawal liability payments, disputing the amount owed in arbitration, fighting liability for making interim payments in a United States district court, and preparing to file for bankruptcy, the insiders in Debtors' companies were pouring vast sums of money into "bonuses, additional compensation, additional expense reimbursement, additional car allowances, insider pension fund payments, and also significant advances made to allow insiders to acquire River City Masonry in Kentucky," all at a time when "the Debtor was clearly insolvent." (Docket No. 27-2 at 25). The amount of money Debtors spent on bonuses, other insider payments, and the acquisition of River City Masonry would have covered Debtors' interim liability withdrawal payments in 2013 and 2014. Additionally, although the Court has declined to reach the issue of whether Debtors "lacked the possibility or reorganization," as a *Laguna* factor supporting a finding of bad faith, the Court does consider as a factor that it is clear from the Debtors' actions pre-petition and their proposed Plan that their trade creditors were substantially paid and that Appellants were particularly disfavored creditors both in terms of what debts Debtors chose to pay  pre-petition and through their proposed Plan. If it were not sufficiently evident from the history between the parties, the Debtors were brazen enough to announce in a press release issued three days after filing for bankruptcy that its purpose in filing bankruptcy was to "resolve" its withdrawal liability with the union. (Docket No. 24-6 at 1). Additionally, the timing of Debtors' filing of their bankruptcy petitions just before the *Boland* court

was going to enter judgment against them also "strongly suggests that the purpose was to evade or avoid withdrawal liability." *Connors v. Vick*, No. CIV. A. 5:91-0289, 1992 WL 200853, at \*4 (S.D.W. Va. Mar. 13, 1992). The Court concludes that this is one of the "egregious cases" that warrant dismissal for bad faith. *In re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991).

The errors made by the Bankruptcy Court in its ruling on Appellants' motion to dismiss for bad faith were errors of law that this Court reviews *de novo*. But even if the Bankruptcy Court's errors were characterized as errors of fact that this Court reviews under the clearly erroneous standard, the Court would conclude that the Bankruptcy Court's findings were in clear error. The clearly erroneous standard has been colorfully described as follows: "a decision must strike [the court] as more than just maybe or probably wrong; it must ... strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *United States v. Searan*, 259 F.3d 434, 447 (6th Cir. 2001) (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990)). The conclusion that Debtors' pre-filing conduct did not constitute bad faith strikes the Court with such a force, and certainly leaves the Court with the firm conviction that a mistake has been committed. Accordingly, the Court concludes that the Bankruptcy Court erred in denying Appellants' motion to dismiss for cause, based on Debtors' bad faith.

**B.      ERISA**

Under § 1129(a)(3), a plan must have "been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Appellants argue that Debtors' Plan fails both of these requirements because its purpose is to evade liability for their withdrawal obligations in violation of ERISA. Appellants' § 1129(a)(3) argument is that, because the Plan is motivated by avoidance of liability for their withdrawal obligations, it was both not "proposed in good faith" and also was

proposed by a "means forbidden by law," namely ERISA § 4212(c), which serves the function of

limiting a withdrawing employer's ability to avoid paying its withdrawal liability:

**(c) Transactions to evade or avoid liability**

If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

29 U.S.C.A. § 1392(c).

Avoidance of withdrawal liability need not be the only purpose of a transaction. But if such

avoidance was "*a* principal purpose," or "*one of the factors* that weighed heavily" in the company's

thinking, it is prohibited by § 4212(c). *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension*

*Fund*, 22 F.3d 725, 727 (7th Cir. 1994) (emphasis added). Because the terms transaction, evade, and

avoid are not defined in ERISA, the court construes them "in accordance with their ordinary and

natural meaning and the overall policies and objectives of the statute." *SUPERVALU, Inc. v. Bd. of*

*Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters & Employers Pension Fund*, 500 F.3d

334, 340 (3d Cir. 2007). In addition, "Congress explicitly called on courts to 'follow the substance

rather than the form' of transactions in determining, assessing, and collecting withdrawal liability."

*CIC-TOC Pension Plan v. Weyerhaeuser Co.*, 911 F. Supp. 2d 1088, 1098 (D. Or. 2012) (quoting

126 Cong. Rec. 23038 (1980)).

The Bankruptcy Court rejected Appellants' contention that ERISA § 4212(c) precluded

confirmation of Debtors' Plan. This Court interprets the Bankruptcy Court's ruling on this issue as

partially a legal conclusion and partly a factual finding:

. . . [I]t would be totally inconsistent to have a provision of ERISA that essentially said that you couldn't use Bankruptcy to restructure a debt. The term evade or avoid is not a defined term under ERISA but there are lots of cases that deal with what the plain meaning of [it] is. One example is the *Super Value* Case at 500 F.3d 334 that talks about the idea that they're essentially synonyms for escaping

from liability and to avoid by deceit or something of that nature, basically, under plain language statutory reading, the provision applies when a contributing employer enters into a transaction that is intended to escape its duty to withdraw. And that usually comes up in connection with transfers of assets. And even though there are some questionable transfers that occurred, there was no indication that there was a wholesale effort to transfer assets to evade or avoid the liability to the Pension Fund.

And it really is just totally contrary to the constitutionally grounded Bankruptcy system to assume that the mere filing of a Bankruptcy could be an attempt to avoid or evade debt. I don't believe it's bad faith for a Debtor that's in need of a fresh start to restructure debts utilizing Chapter 11 to do so. The Bankruptcy Code has lots of protections for preventing less than honest debtors from abusing the Bankruptcy process but the mere filing of a case itself to restructure debt, I don't believe is an attempt to evade or avoid under ERISA.

In this case the Court finds that neither of the Debtors filing the Chapter 11 were attempts to evade or avoid liability but are, instead, an attempt to deal head-on with all creditors, which in this case included the largest one, being the Pension Fund and Union.

. . . In fact, one of the main protections in the Bankruptcy Code for unsecured creditors in this position is the Absolute Priority Rule, which we're going to discuss shortly, and it has its own protections built in.

(Docket No. 27-2 at 20–21).

Debtors cite several cases in which withdrawal liability was among the debts discharged, although none of those cases involved facts such as those before this Court, in which avoiding withdrawal liability was clearly "a principal purpose" of a variety of transactions undertaken by the Debtors leading up to and following the filing of bankruptcy. There is little case law on the legal question of whether § 4212(c) is a source of law that a bankruptcy filing must not violate under § 1129(a)(3), but the Court finds no reason why that would not be the case. *Cf. In re Manchester Oaks Homeowners Ass'n, Inc.*, No. 11-10179-BFK, 2014 WL 961167, at *1 (Bankr. E.D. Va. Mar. 12, 2014) "[T]he Plan has not been proposed 'in good faith and not by any means forbidden by law' under Bankruptcy Code Section 1129(a)(3), because it does not comply with applicable State law concerning homeowner association special assessments."); *In re Am. Capital Equip., Inc.*, 405 B.R.

415, 423 (Bankr. W.D. Pa. 2009) *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. BKY 01-23987, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010) *aff'd sub nom. In re Am. Capital Equip.*, LLC, 688 F.3d 145 (3d Cir. 2012) (holding bankruptcy plan containing an asbestos claims settlement could not be confirmed because it was forbidden under Pennsylvania law). The Debtors engaged in a series of transactions, a principal purpose of which was to evade and avoid withdrawal liability under ERISA. There are two sets of transactions that violate § 4212(c). The first set is the insider financial dealings detailed above which contributed to the financial crisis that precipitated the Debtors' bankruptcy filings. The second offending transaction was the bankruptcy plan itself. A plan of reorganization is "effectively a new contract between the debtor and its creditors." *In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006). Thus, Debtors' Plan is a transaction within the meaning of § 4212(c).

Upon plenary review, the Court concludes the following elements of the Bankruptcy Court's analysis and legal conclusions were erroneous: (1) its failure to consider the pre-filing insider financial transactions and the proposed reorganization plan as the transactions undertaken with "a principal purpose" of evading or avoiding liability under § 4212(c), as the Appellants argued, as opposed to the filing of the bankruptcy petition (Docket No. 24 at 41); (2) its apparent failure to consider whether avoiding withdrawal liability was "a principal purpose" or "one of the factors that weighed heavily" in the Debtors' thinking, *Santa Fe*, 22 F.2d at 727, as evidenced by its failure to cite the proper standard and also as suggested in its statement that "even though there are some questionable transfers that occurred, there was no indication that there was a *wholesale effort* to transfer assets to evade or avoid the liability to the Pension Fund," (Docket No. 27-2 at 20); (3) its apparent conclusion that Debtors had to have acted with "deceit," pursuant to *SUPERVALU*, which

used the word "deceit" when quoting the dictionary definition of "evade," but concluded that "a principal purpose to evade or avoid connotes bad faith" as "[t]he text in no way suggests that it only applies to sham or fraudulent transactions," *SUPERVALU*, 500 F.3d at 341, 343; (4) its conclusion that the problematic insider financial transactions were more appropriately addressed as an issue related to the absolute priority rule as opposed to a potential violation of § 4212(c) of ERISA; and (5) its conclusion that ERISA § 4212(c) legally could not serve as an impediment to confirmation of a bankruptcy plan. As to the latter error, the Bankruptcy Court concluded that Congress could not have intended to remove the possibility of bankruptcy adjustment of withdrawal liability claims without mentioning this limitation in chapter 11. (Docket No. 27-2 at 20–21). However, § 4212(c) does not give withdrawal claims a special, non-dischargeable status, but instead instructs courts to ignore certain improper transactions that have as a principal purpose, the avoidance of withdrawal liability. Although chapter 11 does not mention ERISA, it does require that a plan not be proposed "by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

Debtors cite *In re H.H. Distributions, L.P.*, 400 B.R. 44 (Bankr. E.D. Pa. 2009), in which it was "undisputed that the pension withdrawal liability [was] the cause for filing these bankruptcy cases." *Id.* at 48. In a footnote, the court stated its disagreement with a pension fund's "complain[t] that the use of bankruptcy solely to avoid payment of the Fund is evidence of bad faith," because "[b]ankruptcy is an appropriate tool for dealing with obligations that are beyond a firm's ability to presently pay." *Id.* at 48 n.4. The court further noted, "What may be bad faith is an attempt to use bankruptcy to avoid payment and fail to propose a plan that is fair and equitable to that creditor." *Id.* The court denied confirmation on other grounds. Of the cases cited by Debtors, this is the one

most directly on point,[4] though the court's discussion is brief, consisting of nothing more than the few sentences quoted from a footnote in the opinion. For the reasons given herein, this Court disagrees that transactions preceding and during a bankruptcy proceeding, such as the ones that occurred in this case, cannot violate § 4212(c).

To the extent that the Bankruptcy Court intended to make a factual finding that the series of insider financial transactions and the proposed bankruptcy reorganization plan were not attempts to evade or avoid their withdrawal liabilities, the Court concludes that this finding was clearly erroneous, as the Court has the firm conviction, for the reasons previously articulated, that the Debtors did undertake a series of transactions with the intention to evade and avoid withdrawal liability. Again, the Bankruptcy Court's factual finding on this issue is problematic as it rested on a series of legal errors as detailed above. The Court concludes that the Debtors engaged in a series of transactions with a principal purpose of avoiding and evading their withdrawal liability, in violation of § 4212(c). As a result, the Bankruptcy Court erred in confirming the Plan, which was created by a "means forbidden by law," and was not "proposed in good faith," as required by 11 U.S.C. § 1129(a)(3).

### C. Absolute Priority Rule

Although there is a serious question about whether Debtors have satisfied the new value exception to the absolute priority rule, because the Court's rulings as to the impact of ERISA as well as Debtors' bad faith resolve this appeal, the Court does not reach that issue.

---

[4]Other cases cited by Debtors are not directly on point for various reasons. For example, they cite *In re City of Detroit, Mich.*, 504 B.R. 191, 281–82 (Bankr. E.D. Mich. 2013) for the proposition that filing bankruptcy for the purpose of discharging non-guaranteed pension-related claims of city employees does not suggest bad faith, but ERISA does not apply to public employee pensions, so this case is not instructive.

**IV.     Conclusion**

For the foregoing reasons, the Court will reverse the Bankruptcy Court's orders confirming

Debtors' Second Amended Joint Chapter 11 Plan and denying Appellants' motion to dismiss.

An appropriate order is filed herewith.


_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE